<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| HONG ZHUANG, | |
| Plaintiff, | Case No. 3:18-cv-01432 (BRM) (TJB) |
| v. | **OPINION** |
| EMD PERFORMANCE MATERIALS CORP., | |
| Defendant. | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are (1) Defendant EMD Performance Materials Corp.'s ("EMD PM") Motion for Judgment on the Pleadings (ECF No. 85), (2) EMD PM's Motion for Summary Judgment (ECF No. 86), and (3) Plaintiff Hong Zhuang's ("Zhuang") Cross-Motion for Partial Summary Judgment (ECF No. 92). All motions are opposed. (ECF Nos. 90, 91, and 98.) Having reviewed the parties' submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, EMD PM's Motion for Judgment on the Pleadings is **DENIED as MOOT**, EMD PM's Motion for Summary Judgment is **GRANTED in part and DENIED in part**, and Zhuang's Cross-Motion for Summary Judgment is **DENIED**.

I.        **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

This is an employment discrimination matter involving Zhuang's claims that she was harassed during her employment at EMD PM and unfairly terminated by the company on April 3, 2017.[2] On February 8, 2018, Zhuang filed her original complaint against EMD PM. (ECF No. 1.) On April 2, 2018, she amended the complaint as of right after EMD PM moved to dismiss her original complaint. (*See* ECF Nos. 7, 11.) On April 16, 2018, EMD PM moved to dismiss Zhuang's amended complaint. (ECF No. 13.) The Court granted in part and denied in part EMD PM's motion to dismiss. (*See* ECF Nos. 24 and 25.) Thereafter, on August 24, 2018, EMD PM answered Zhuang's amended complaint. (ECF No. 28.) On August 27, 2018, the Honorable Judge Tonianne J. Bongiovanni entered an order setting the initial scheduling conference for November 19, 2018. (ECF No. 29.) On January 25, 2019, Zhuang formally moved for leave to file a second amended complaint. (ECF No. 41.) Judge Bongiovanni granted Zhuang's motion on April 8, 2019. (*See* ECF Nos. 47 and 48.) Zhuang filed the second amended complaint on April 17, 2019. (ECF No. 49.) EMD PM answered on May 1, 2019. (ECF No. 53.) On May 9, 2019, counsel entered an appearance on behalf of Zhuang who had, until that time, been representing herself *pro se*. (ECF No. 55.) Thereafter, on June 7, 2019, Zhuang filed her third motion to amend the complaint (ECF No. 66) and EMD PM opposed. (ECF No. 67.) Judge Bongiovanni granted the motion on July 10, 2019. (*See* ECF Nos. 69 and 70.) The third amended complaint ("TAC") was

---

[1] In the interest of judicial economy, the Court refers the parties to three separate opinions: (1) *Hong Zhuang v. EMD Performance Materials Corp.*, Civ. A. No. 18-1432 (BRM) (TJB), 2018 WL 3814282 (D.N.J. Aug. 10, 2018); (2) *Hong Zhuang v. EMD Performance Materials Corp.*, Civ. A. No. 18-1432 (BRM) (TJB), 2019 WL 1547272 (D.N.J. Apr. 8, 2019); and (3) *Hong Zhuang v. EMD Performance Materials Corp.*, Civ. A. No. 18-1432 (BRM) (TJB), 2019 WL 3037568 (D.N.J. July 10, 2019).

[2] The parties and the Court are familiar with this matter. As a result, the facts of this case are not restated at length herein. Instead, only those facts relevant to the pending motions are discussed.

filed on July 11, 2019. (ECF No. 71.) EMD PM answered the TAC on July 26, 2019. (ECF No. 74.) A second amended scheduling order was set for January 15, 2020 by Judge Bongiovanni on October 21, 2019 indicating all discovery shall be raised by January 17, 2020, and any dispositive motions are due by February 21, 2020. (ECF No. 80.) Following a letter from EMD PM, Judge Bongiovanni filed a text order ordering dispositive motions were to be filed by May 22, 2020 instead. (*See* ECF No. 84.) On May 22, 2020, EMD PM filed a Motion for Judgment on the Pleadings concerning Count II of the TAC, which alleges retaliation in violation of *Pierce v. Ortho Pharma. Corp.*, 417 A.2d 505 (N.J. 1980) ("*Pierce*") pursuant to Federal Rule of Civil Procedure 12(c) (ECF No. 85), and a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 86.) On June 22, 2020, Zhuang filed an opposition to the Motion for Judgment on the Pleadings (ECF No. 90) and a combined brief in opposition to EMD PM's Motion for Summary Judgment and in support of a Cross-Motion for Partial Summary Judgment. (*See* ECF Nos. 91 and 92.)[3] EMD PM opposed the Cross-Motion for Partial Summary Judgment on July 20, 2020. (ECF No. 98.)

## II. LEGAL STANDARD

### A. Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Pursuant to Rule 12(c), the movant for judgment on the pleadings must establish: (1) that no material issue of fact remains to be resolved; and (2) the entitlement to judgment as a matter of

---

[3] ECF No. 91 contains the memorandum in support of Zhuang's motions and ECF No. 92 provides notice of Zhuang's Cross-Motion for Partial Summary Judgment in favor of Zhuang on Count I of the TAC.

law. *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)). In resolving a motion made pursuant to Rule 12(c), the Court must view the facts in the pleadings and the inferences therefrom in the light most favorable to the non-movant. *See Rosenau*, 539 F.3d at 221.

Furthermore, even though a motion for judgment on the pleadings is appropriate after the pleadings have been closed, such a motion is reviewed under the same standards that apply to a motion to dismiss made under Rule 12(b)(6). *See Szczurek v. Prof'l Mgmt. Inc.*, 627 F. App'x 57, 60 (3d Cir. 2015) (citing *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010)); *see also Muhammad v. Sarkos*, Civ. A. No. 12-7206, 2014 WL 4418059 (D.N.J. Sept. 8, 2014) ("Where a defendant's motion is one for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), it is treated under the same standards as a Rule 12(b)(6) motion where it alleges that a plaintiff has failed to state a claim.") (citing *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991)); *see Gebhart v. Steffen*, 574 F. App'x 156, 157 (3d Cir. 2014).

### B. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district

4

court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

Pursuant to Federal Rule of Civil Procedure 56(d),

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
>> (1) defer considering the motion or deny it;
>>
>> (2) allow time to obtain affidavits to take discovery; or
>>
>> (3) issue any other appropriate order.

A party who submits an affidavit pursuant to Rule 56(d), "specify[], for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Penn., Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 157 (3d Cir. 2012) (quoting *Dowling v. City of Phila.*, 855 F.2d 136, 139–40 (3d Cir. 1988)). If the nonmovant

> files an affidavit that addresses these three requirements with specificity, and especially when particular information, necessary to the successful opposition to summary judgment, is in the sole possession of the moving party, the Third Circuit has held that 'a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.'

*Malouf v. Turner*, 814 F. Supp. 2d 454, 459 (D.N.J. 2011) (quoting *Sames v. Gable*, 732 F.2d 49, 51 (3d Cir. 1984)). However, the nonmovant cannot defeat summary judgment by offering

"[v]ague or general statements of what [it] hopes to gain through a delay for discovery." *Id.* at 459–60 (quoting *Hancock Indus. v. Schaffer*, 811 F.3d 225, 230 (3d Cir. 1987)).

This governing standard does not change when the parties file cross-motions for summary judgment. *Hartford Cas. Ins. Co. v. Peerless Ins. Co.*, Civ. A. No. 10-6235, 2016 WL 5723659, at *4–5 (D.N.J. Sept. 30, 2016). Indeed, "[t]he court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (citations omitted); *Arzadi v. Evanston Ins. Co.*, Civ. A. No. 17-5470, 2018 WL 747379, at *2 (D.N.J. Feb. 7, 2018).

## III. DECISION

### A. EMD PM's Motion for Judgment on the Pleadings

In Count II of the TAC, Zhuang seeks to bring a common law claim against EMD PM for "retaliatory harassment," in the form of wrongful termination also known as a "*Pierce*" claim. (ECF No. 71 ¶¶ 108–10; *see Pierce*, 417 A.2d 505.) Specifically, Zhuang accuses EMD PM of wrongful discharge on account of EMD PM terminating her out of retaliation for her objection and refusal to participate in activities which she believed violated the law and public policy. (ECF No. 71 ¶¶ 103–07.)

EMD PM contends Zhuang alleges parallel claims pursuant to the New Jersey State Conscientious Employee Protection Act, N.J.S.A. 34:19-1, *et seq*. ("CEPA") and the New Jersey state common law claim of retaliation set forth in *Pierce.* Specifically, according to EMD PM, Zhuang's CEPA and *Pierce* claims arise from identical allegations of retaliation resulting from alleged objections and/or refusal to participate in activities relating to, *inter alia*, the release of

liquid crystal ("LC") labels, which is barred by CEPA's waiver provision which prevents Zhuang from maintaining a *Pierce* claim while also bringing a CEPA claim. (ECF No. 85-1 at 2–3.)

Zhuang admits she recognizes she cannot pursue her claims under both CEPA and *Pierce* at trial, but contends there is no reason she must make such an election before a motion for summary judgment has been decided "since the filing of a CEPA claim which is subsequently found to be legally deficient does *not* waive other claims of retaliation." (ECF No. 90 at 3–4.) According to Zhuang, under CEPA's waiver provision, Zhuang must be permitted to "make a knowing and meaning election" between pursuing her CEPA and her *Pierce* claim. (*Id.* at 3.) Therefore, the Court should give her the opportunity to decide whether to pursue her CEPA claim or *Pierce* claim after the Court has ruled on her motion for summary judgment. (*Id.* at 3–4.)

The Court need not reach the merits of EMD PM's Motion for Judgment on the Pleadings because, as discussed more fully below, the Court grants EMD PM's Motion for Summary Judgment and denies Zhuang's Cross-Motion for Summary Judgment on Zhuang's CEPA claim.

Accordingly, EMD PM's Motion for Judgment on the Pleadings is **DENIED as MOOT**.

### B. Parties' Motions for Summary Judgment

#### 1. Retaliation in Violation of CEPA (Count I)

Count I of the TAC alleges violations of CEPA against EMD PM. (ECF No. 71 ¶¶ 102–07.) The crux of Zhuang's CEPA claim is Zhuang was retaliated against by EMD PM based upon her belief (and corresponding whistleblowing activity) that EMD PM was engaging in violations of applicable law and/or regulations, specifically the NJRTK Act,[4] with respect to

---

[4] Under the New Jersey Worker and Community Right to Know Act, N.J.S.A. 34:5A-1, *et seq*. ("NJRTK Act"), hazardous chemical containers in the workplace need to be labeled. *See* N.J.A.C. §§ 8:59-5.1 to 5.10.

EMD PM failing to adequately check LC labels and failing to disclose all required information on chemical container labels. (*Id.* at 6–10.)

CEPA was enacted to protect employees who report illegal or unethical actions in the workplace, and to encourage such reporting. *Fleming v. Corr. Healthcare Solutions, Inc.*, 751 A.2d 1035 (N.J. 2000). New Jersey courts apply the familiar *McDonnell Douglas* burden-shifting framework in evaluating claims under the statute.[5] *Mehalis v. Frito-Lay, Inc.*, Civ. A. No. 08-1371, 2012 WL 2951758, at *4 (D.N.J. July 2, 2012), *aff'd*, 536 F. App'x 302 (3d Cir. 2013). In order to state a prima facie retaliation case under CEPA, a plaintiff must prove by a preponderance of the evidence: (1) he or she reasonably believed his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a whistleblowing activity described in N.J. Stat. Ann. § 34:19–3c; (3) an adverse employment action was taken against him or her; *and* (4) a causal connection exists between the whistleblowing activity and the adverse employment action. *Id.*; *Massarano v. New Jersey Transit*, 948 A.2d 653, 662 (N.J. Super. Ct. App. Div. 2008). The burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for taking the employment action, after which it is the employee's burden to demonstrate pretext by a preponderance of the evidence. *See Choy v. Comcast Cable Commc'ns, LLC*, 629 F. App'x 362, 364 (3d Cir. 2015); *Klein v. Univ. of Med. and Dentistry*, 871 A.2d 681 (N.J. Super. Ct. App. Div. 2005).

Zhuang alleges she is entitled to summary judgment because she has alleged, *inter alia*, the following whistleblowing activities are protected by CEPA:

    i.    Zhuang "objected to," and disclosed to her supervisor, her belief that EMD PM would violate the NJRTK Act if it stopped listing all hazardous components on

---

[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

chemical containers in its New Jersey facility, and instead listed only hazardous components included on the NJRTK Act Hazardous Substance List, a list of only the most common hazardous components. (*See* ECF No. 91 at 26.)

ii.   On February 3, 2017, she sent an email to Director, Paul Newcomb ("Newcomb") asking whether EMD PM was "requiring her to list some or all hazard components on chemical container labels," and stating that "including all hazard component information would be more in compliance with the NJRTK Act," meaning listing only some hazard components would not have been in full compliance with the law. (*Id.*)

iii.  On March 15, 2017, after Luciana Felix, Head of Hazardous Communication ("Felix"), indicated EMD PM was planning to completely remove NJRTK Act labeling for chemicals manufactured in New Jersey, Zhuang emailed a copy of the NJRTK Act regulations to Felix and others because she did not believe any exemption from the labeling requirements applied. (*Id.*)

iv.   Zhuang refused to participate in EMD PM's new practice and instead continued to include NJRTK Act information on label templates for products manufactured in New Jersey because she believed the law required EMD PM to do so. (*Id.* at 27.)

v.    Zhuang "objected to" and "refused to" release LC labels until someone qualified reviewed them to determine if they complied with the law. (*Id.* at 28.)

vi.   Zhuang reasonably believed the law required someone familiar with LC labeling requirements to determine if the LC labels met all applicable legal requirements. (*Id.*)

vii.  Zhuang refused to release the LC labels even after Felix directed her to do so because she believed nobody had adequately reviewed the labels to confirm they complied with the law. (*Id.*)

Zhuang alleges she was subjected to the following retaliatory actions because of her allegedly protected conduct:

i.    On January 5, 2017, the day after Zhuang refused to release LC labels until someone qualified checked to ensure they complied with the law, Felix claimed, for the first time ever, that Zhuang's "overall individual performance [] partially met expectations." (*Id.* at 30.) In the same email, Felix criticized Zhuang by claiming she is "afraid to make decisions, prioritize tasks and provide input in areas that she is not 100% familiar." (*Id.*)

ii.   Zhuang's job performance was reduced from an "A" to a "C." (*Id.* at 31.)

      iii.  On April 3, 2017, at a performance improvement plan ("PIP") meeting, Zhuang was fired by Human Resources Partner, Kristi-Ann Dye ("Dye"). (*Id.*)

EMD PM seeks summary judgment with regard to Zhuang's CEPA claim on two theories: first, Zhuang's CEPA claim is time-barred; and second, Zhuang cannot make out the prima facie elements of a CEPA claim. (ECF No. 86-1 at 31.) The Court need not address EMD PM's second argument as Zhuang's CEPA claim is time-barred.

"An employee's CEPA claim accrues on the date of his actual demotion, suspension or termination of employment." *Villalobos v. Fava*, 775 A.2d 700, 707 (N.J. Super. Ct. App. Div. 2001). The text of CEPA sets forth a one-year statute of limitations. *Walters v. Safelite Fulfillment, Inc.*, Civ. A. No. 18-11111, 2019 WL 7343481, at *3 (D.N.J. Dec. 31, 2019). "Upon a violation of any of the provisions of this act, an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction." N.J. Stat. Ann. § 34:19–5. Zhuang was terminated on April 3, 2017. (ECF No. 71 ¶ 89.) Zhuang did not state a claim under CEPA until her second amended complaint which was filed on April 17, 2019. (ECF No. 49 at 5.) Therefore, Zhuang's claim is time-barred by CEPA's one-year statute of limitations. *See Robles v. U.S. Envtl. Universal Servs., Inc.*, 469 F. App'x 104, 107 (3d Cir. 2012); *Andrews v. Hanover Marriot*, Civ. A. No. 06-1039, 2008 WL 11383866, at *7 (D.N.J. June 25, 2008).

Contrary to Zhuang's contention, Zhuang's claim will not be saved by the relation-back theory as Zhuang's CEPA claim is entirely distinct from her claims of discrimination asserted in her original complaint and first amended complaint. (*See* ECF No. 91 at 41–42.) Indeed, Zhuang's claims asserted in the original complaint and first amended complaint involve allegations of discrimination based on age, disability, and race only. (*See* ECF Nos. 1, 11.) As such, the CEPA

claim, filed on April 17, 2019—more than two years after Zhuang's discharge and more than one year after applicable statute of limitations—is time-barred.[6]

Accordingly, EMD PM's Motion for Summary Judgment as to Count I is **GRANTED** and Zhuang's Cross-Motion for Summary Judgment is **DENIED**.

### 2. Retaliation in Violation of *Pierce* (Count II)

Zhuang brings a common law claim for wrongful discharge in violation of public policy. (ECF No. 71 ¶¶ 108–10.) Zhuang did not oppose EMD PM's Motion for Summary Judgment as to the *Pierce* claim.[7] This Court, however, finds EMD PM's Motion for Summary Judgment on Count II is denied.

To establish a wrongful discharge claim under New Jersey law, a plaintiff must (1) identify a clear mandate of public policy violated by his termination; (2) allege that he made complaints about, or refused to participate in, conduct by defendants that violated that public policy; and (3) establish that he was discharged in retaliation for opposing the conduct of defendants that violated the public policy at issue. *See Pierce*, 417 A.2d at 512.

The Court finds Zhuang raised a genuine issue of material fact as to her wrongful discharge claim. Indeed, Zhuang asserts she was retaliated against because:

> Dr. Zhuang objected to and/or refused to participate in activities which she reasonably believed violated the law, regulations promulgated pursuant to law and/or a clear mandate of public policy

---

[6] Aside from not alleging any facts concerning retaliation in violation of CEPA or *Pierce* in the amended complaint (*see* ECF No. 11 at 7–23), on the EEOC intake questionnaire ("Intake Questionnaire") in response to the question "What is the reason (basis) for your claim of employment discrimination?" Zhuang did not check the box next to "Retaliation." (ECF No. 11-2 at 2.) She only checked the boxes next to "Race" and "Age." (*Id.*)

[7] Zhuang filed an opposition to EMD PM's Motion for Judgment on the Pleadings concerning waiver of the *Pierce* claim (*see* ECF Nos. 85, 90) but does not reference *Pierce* in her opposition to EMD PM's Motion for Summary Judgment or Cross-Motion for Summary Judgment brief. (*See* ECF No. 91.)

> with respect to: (1) LC labels properly disclosing hazardous substances; and (2) hazardous chemical labels complying with NJRTK Act labeling requirements.

(ECF No. 71 at 16.)

EMD PM does not deny on January 5, 2017, the day after Zhuang refused to release LC labels, Felix wrote in an email titled "Performance assessment," "Hong is afraid of making decision, prioritize tasks and provide input in areas that she is not a hundred percent familiar." (ECF No. 91-1, Dep. Tr. L. Felix at 138:22–139:2.) Felix admitted she made those comments in response to Zhuang refusing to release the LC labels. (*Id.* at 139:6.) On the same day, EMD PM reduced Zhuang's performance rating from an "A" to a "C" and added new criticism to her 2016 performance review. (*Id.* at 135–36.)

A reasonable jury could find EMD PM terminated Zhuang because of her refusal to release LC labels. *See Maimone v. City of Atlantic City*, 903 A.2d 1055, 1064 (N.J. 2006) (temporal proximity is circumstantial evidence of causation). This Court will therefore deny EMD PM's motion for summary judgment as to Zhuang's claim for wrongful discharge in violation of public policy. *Martelack v. Toys R US*, Civ. A. No. 13-7098, 2016 WL 762656, at *5–6 (D.N.J. Feb. 25, 2016).

Accordingly, EMD PM's Motion for Summary Judgment as to Count II is **DENIED**.

### 3. Federal Claims for Discrimination - Associational Disability Discrimination under ADA (Count III), Title VII Race Discrimination (Count IV), and ADEA Age Discrimination (Count VII)

According to EMD PM, Zhuang's discrimination claims under Title VII and ADA fail because she "did not exhaust her administrative remedies by filing a charge of discrimination with the EEOC relating to these claims." (ECF No. 86-1 at 19.) EMD PM argues Zhuang's filing of the Intake Questionnaire with the EEOC cannot satisfy the administrative exhaustion requirement because it is not a formal charge. (ECF No. 86-1 at 10.) As exhaustion is a prerequisite to bringing

an ADA, Title VII, and ADEA suit, the Court will first address this threshold issue. *See, e.g.*, *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 109 (3d Cir. 2014); *Churchill v. Star Enters.*, 183 F.3d 184, 191 (3d Cir. 1999).

Prior to initiating an action under the ADA, ADEA, or Title VII, a plaintiff must file a charge with the EEOC within either 180 or 300 days of the alleged unlawful employment action, depending upon whether the state has an anti-discrimination law. *See* 42 U.S.C. § 2000e-5 (Title VII); 29 U.S.C. § 626(d) (ADEA); 42 U.S.C. § 12117(a) (ADA); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("Plaintiffs bringing employment discrimination charges under the ADA must comply with the procedural requirements set forth in Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e-5."); *Cardenas v. Massey*, 269 F.3d 251, 255 (3d Cir. 2001). "[B]ecause New Jersey has an anti-discrimination law, a claim must be presented to the EEOC within 300 days of the alleged unlawful employment practice." *Cardenas*, 269 F.3d at 255 n.2. A plaintiff's failure to exhaust administrative remedies prior to filing a charge of discrimination under the ADEA, ADA, or Title VII warrants dismissal. *See Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000) ("Under Title VII and the ADEA, plaintiffs residing in states having an agency authorized to grant relief for federally prohibited employment discrimination must resort to that state remedy before they will be allowed access to federal judicial relief."). Additionally, after filing a charge with the EEOC, a plaintiff must receive a "right to sue" letter before filing with the district court. *Ditzel v. Univ. of Med. & Dentistry of N.J.*, 962 F. Supp. 595, 602 (D.N.J. 1997); *Burgh v. Borough Council*, 251 F.3d 465, 470 (3d Cir. 2001) (stating the EEOC will then investigate the charge, and the plaintiff must wait until the EEOC issues a right-to-sue letter before she can initiate a private action).

Critically, however, it is important to recognize that Title VII, the ADA, and ADEA establish "a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 264 (3d Cir. 2006) (quoting *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 115 (2002)). Therefore, "the system must be accessible to individuals who have no detailed knowledge of the relevant statutory mechanisms and agency processes." *Federal Express v. Holowecki*, 552 U.S. 289, 403 (2008); *see also Love v. Pullman Co.*, 404 U.S. 522, 527 (1972) ("[T]echnicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.") There must be some "level of malleability in determining whether a plaintiff properly filed a discrimination charge." *D'Ambrosio v. Cresthaven Nursing & Rehab. Ctr.*, Civ. A. No. 14-06541, 2016 WL 5329592, at *6 (D.N.J. Sept. 22, 2016), *aff'd sub nom. D'Ambrosio v. Crest Haven Nursing & Rehab. Ctr.*, 755 F. App'x 147 (3d Cir. 2018).

Against that background and acknowledging Zhuang initiated this suit *pro se*, this Court will construe Zhuang's Intake Questionnaire (*see* ECF No. 11) as a charge, and finds all of Zhuang's claims in the Intake Questionnaire were within the 300 day limitation period and will, therefore, be heard by this Court. *See D'Ambrosio*, 2016 WL 5329592, at *6.[8]

---

[8] Zhuang's filing of the Intake Questionnaire counts as a charge of discrimination because it generated a response from the EEOC and a subsequent notification of the charges to EMD PM. (*See* ECF No. 11-3, Notice of Charge of Discrimination). "While a timely-filed intake questionnaire is not a per se charge of discrimination, when the questionnaire fulfills the core purpose of an EEOC charge by informing employers that they are prospective defendants in a discrimination case, the questionnaire will be deemed the formal charge." *D'Ambrosio*, 2016 WL 5329592, at *5; *see also Barzanty v. Verizon PA, Inc.*, 361 F. App'x 411, 415 (3d Cir. 2010) ("the central purpose of a charge is to put the employer on notice of the allegations"); *Occidental Life Ins. Co. of Cal v. EEOC*, 432 U.S. 355, 359–60 (1977) (same). While the Notice of Charge of Discrimination states only "[t]he circumstances of the alleged discrimination are based on Race and Age," brought under Title VII and ADEA, the Intake Questionnaire and accompanying documents also describe disability discrimination. (ECF No. 11-3 at 1.) The Court, therefore, for purposes of this suit, will consider the disability discrimination allegations timely.

### i.   ADA (Count III)

EMD PM argues Zhuang's associational disability claims pursuant to the ADA fail as a matter of law because Zhuang has not established her employment was terminated because she was associated with her disabled husband. (ECF No. 86-1 at 13.) Zhuang contends there are genuine issues of material fact as to her associational disability claim. (*See* ECF No. 91 at 41.) Specifically, she argues Felix and Newcomb both knew her husband had advanced lung cancer, she was fired despite the fact her job performance met expectations, and EMD PM knew Zhuang was likely going to need time off to take care of her husband. (*Id.*)

Under 42 U.S.C. § 12112(b)(4) of the ADA, an employer is prohibited from discriminating against an employee as a result of "the known disability of an individual with whom [the employee] is known to have a relationship or association." Employment discrimination claims brought pursuant to the ADA apply the burden-shifting framework set forth in *McDonnell Douglas. See Huggard v. Crown Bank*, Civ. A. No. 11-6194, 2012 WL 529548, at *3 (D.N.J. Feb. 17, 2012); *Olson v. Gen. Elec. Astrospace*, 966 F. Supp. 312, 315 (D.N.J. 1997). Pursuant to this framework, "a plaintiff must first make out a prima facie case of discrimination. Upon establishing a prima facie case, the burden of production shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's termination." *Huggard*, 2012 WL 529548, at *3.

To establish a prima facie case of associational discrimination under the ADA, a plaintiff must show that:

> (1) he was in a protected class (*i.e.*, an individual known to have an association or relationship with an individual who has a known disability); (2) he was discharged; (3) at the time of his discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under

circumstances that raise a reasonable inference of unlawful discrimination.

*Id.* (citing *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011)).

Although an employer is prohibited from discriminating against an employee as a result of his association with a disabled relative, "the association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative." *Id.* (quoting *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 510 (3d Cir. 2009)). While refusing to make reasonable accommodations might constitute illegal discrimination against a disabled employee, 42 U.S.C. § 12112(b)(5), "the plain language of the ADA indicates that the accommodation requirement does not extend to relatives of the disabled." *Erdman*, 582 F.3d at 510 (citing 29 C.F.R. § 1630.8, Appendix (providing that "[i]t should be noted [] that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities"); *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1084 (10th Cir. 1997) ("[T]he plain language of [§§ 12112(b)(5)(A) and (B)]—the only two provisions requiring 'reasonable accommodation' in Title I of the ADA—suggests that only job applicants or employees, but not their relatives or associates, need be reasonably accommodated."); *Larimer v. IBM*, 370 F.3d 698, 700 (7th Cir. 2004) ("[T]he right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.")).

"Under the association provision, there is a material distinction between firing an employee because of a relative's disability and firing an employee because of the need to take time off to care for the relative." *Erdman*, 582 F.3d at 510. An unlawful termination must be "motivated by the known disability of an individual with whom an employee associates, as opposed to actions occasioned by the association." *Id.* (citation omitted). To be unlawful, the termination must be

motivated by the disability rather than a plaintiff's stated intention to miss work; "in other words, that [the plaintiff] would not have been fired if [he] had requested time off for a different reason." *Id.*

The Court finds Zhuang is unable to satisfy the first and fourth prong necessary to make out a prime facie claim. Zhuang has failed to establish she was performing her job at a level that met her employer's legitimate expectations. Indeed, she was terminated at a meeting designed to address her performance inadequacies. She was placed on a PIP for 60 days to give her an "opportunity to improve [her] performance at the company," including specifically, "interrupting speakers," "raising [her] voice during meetings," "consistently challenging [] assignments [] managers give[] [her]," and "refusing to share information with employees." (ECF No. 86-3 at 151.) A January 5, 2017 email from Felix to Newcomb concerning Zhuang describes that while "Hong works well by herself," "she did not show good collaboration skills or good integration in the new organization [with Merck]."[9] (ECF No. 91-1 at 404). Further, the email provides:

> When asked to coach a new employee, Hong didn't want to support as this would disrupt her daily activities. I received complaint from other team member. The employee approached her several times and she could not work with him, she told him that she is afraid to share her knowledge and get dismissed. I also asked her to share her daily work activities with him and she didn't do it. When compared with other senior members of the team, her collaborative skills are much lower. We are a small team and we can not allow the silo mentality in the team. In addition to the lack of collaborative skills, Hong is afraid of making decisions, prioritize tasks and provide input in areas that she is not 100% familiar. As a senior member of the team this should be part of her skills. Overall she is performing below the expectations for her senior role.

(*Id.*) Accordingly, Zhuang has failed to establish a prima facie case.

---

[9] Merck appears to be the parent company of EMD PM. (ECF No. 91-1 at 142.)

Moreover, Zhuang has failed to establish her termination occurred under circumstances that raise a reasonable inference of unlawful discrimination. The record is devoid of any evidence indicating EMD PM's decision to terminate her was motivated by her husband's disability. The PIP meeting that took place on April 3, 2017 was attended by Zhuang, Newcomb, Felix, and Dye. (ECF No. 91-1, Dep. Tr. P. Newcomb at 110:6–12.) Broadly, the purpose of the PIP meeting was to discuss the terms of the PIP, the issues Zhuang was having with her job, the areas of concern, and the requirements of the PIP. (*Id.* at 112:11–15.) According to Newcomb, during the meeting,

> Hong just repeatedly kept interrupting, bringing up other issues. Kristi Dye repeatedly told her to focus on the PIP. And then she continued to bring up other issues and deviate from the PIP. And Kristi started telling her that I'm going to terminate you if you don't focus. She told Hong this about three different times.

(*Id.* at 112:12–25.)[10] Eventually, Dye terminated Zhuang at the meeting. After the meeting, Dye, in an email dated April 3, 2017 and titled "Hong Zhuang Outcome," wrote:

> Hong would not listen and keep lobbying for her recollections of the situation, bring in emails, disputing the examples. I was clear and told her 3 times we'd have to terminate her if she would not listen and confirm commitment to improve. After numerous attempts to focus her back on the PIP, I terminated her. She admitted at least 2 times that she was disrespectful to her manager. She also admitted to prolonging progress with training of another employee, yet still was arguing about the output and cooperation. She simply doesn't have the ability to refocus just kept dwelling in the past. This is the best scenario for us.

(ECF No. 86-3 at 155.)[11]

---

[10] The first area of concern noted in the PIP was "[c]reating a disruptive and unwelcoming environment for other employees by, for example: [i]nterrupting speakers during meetings . . . . " (ECF No. 86-3 at 149.)

[11] This email was addressed to several employees, including Karl Hensen at the head office of Merck in Germany, with a copy to Newcomb and Felix.

Moreover, Zhuang has failed to demonstrate EMD PM or any employee made a single derogatory comment concerning her husband. In fact, Zhuang stated in her deposition that no one ever made any negative comments about or concerning her husband. (ECF No. 86-3, H. Zhuang Dep. Tr. at 114:20–115:1 "Q: Did anyone in your chain of command ever make negative remarks about your husband's condition? A. No."). Because EMD PM was not required to accommodate Zhuang, Zhuang must establish the termination was "motivated by" her husband's disability, "as opposed to actions occasioned by the association." *Id.* (citation omitted); *Erdman*, 582 F.3d at 510. Zhuang has failed to demonstrate her termination was motivated by her husband's disability, rather than anything other than her job performance. As such, Zhuang has also failed to establish the fourth prong. *Erdman*, 582 F.3d at 509–11 (affirming the district court's grant of summary judgment on the ADA claim where no reasonable jury could conclude plaintiff was terminated because of relative's known disability).

Accordingly, EMD PM's Motion for Summary Judgment as to Count III is **GRANTED**.

### ii. ADEA (Count VII)

EMD PM moves for summary judgment as to Zhuang's claim of age discrimination under the ADEA. EMD PM argues: (1) Zhuang cannot meet her burden of establishing a prima facie claim of age discrimination and (2) Zhuang cannot show EMD PM's legitimate non-discriminatory reason for terminating Zhuang is pretextual. Zhuang does not appear to oppose EMD PM's motion. (*See generally* ECF No. 91.)

The ADEA makes it unlawful for an employer to, *inter alia*, "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). It is also unlawful for the employer to "limit, segregate, or classify"

employees in a way that would "deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." *Id.* § 623(a)(2); *O'Malley v. Fairleigh Dickinson Univ.*, Civ. A. No. 10-6193, 2014 WL 67280, at *8 (D.N.J. Jan. 7, 2014).

In the absence of direct evidence of discrimination, a claim for discrimination under the ADEA (as well as under Title VII, as discussed below) is evaluated by a three-step test. *See Smith v. City of Allentown*, 589 F.3d 684, 689–91 (3d Cir. 2009); *see also Ptasznik v. Univ. of Pennsylvania*, 523 F. App'x 156, 159 (3d Cir. 2013) (noting that proof methods are direct evidence of discrimination or indirect evidence meeting three-step test). This test, developed in the Title VII context in *McDonnell Douglas*, requires the plaintiff to first demonstrate a *prima facie* case of discrimination. *Smith*, 589 F.3d at 689; *see McDonnell Douglas*, 411 U.S. 792. If shown, "the burden of production shifts to the employer to identify a legitimate non-discriminatory reason for the adverse employment action." *Smith*, 589 F.3d at 690. "If the employer does so, the burden of production returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for age discrimination." *Id.* The plaintiff always bears the burden of persuasion. *Id.* Further, part of the plaintiff's burden of persuasion involves proving "that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176–77 (2009).

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show that: "(1) she is forty years of age or older; (2) the defendant took an adverse employment action against her; (3) she was qualified for the position in question; and (4) she was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). "To establish a prima facie case at summary judgment, 'the evidence must be sufficient to convince a reasonable

factfinder to find all of the elements of [the] prima facie case.'" *Id.* (quoting *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)). Therefore, if the plaintiff does not raise a genuine dispute of material fact as to even one of the required elements, "she has not met her initial burden, and summary judgment is properly granted for the defendant." *Id.*

Zhuang has not presented sufficient evidence for her ADEA claim to survive even the first step of the *McDonnell Douglas* test—that she make out a prima facie case of age discrimination. While she meets the age requirements and EMD PM terminated her employment, the record on summary judgment is rife with material indicating her performance was deficient and that EMD PM made its termination decision based on these deficiencies.[12]

Indeed, even if the burden of production were to shift to her employer to proffer a legitimate, non-discriminatory reason for terminating her, EMD PM has done that. Aside from the negative performance reviews from EMD PM, which Zhuang challenges as a product of EMD

---

[12] When asked in her deposition, Zhuang stated she believed being referred to as a "senior member of a young team" was derogatory. (ECF No. 91-1, Dep. Tr. H. Zhuang at 80:8–9.) Later, she stated she understood the term "senior" could refer to experience or expertise level. (*Id.* at 17–23.) Generally, Zhuang describes she was "criticized or required of something extra that young members were not required." (*Id.* at 71:25–72:1.) For example, she testified she "was required to take on all projects, all products. I was required to make judgments or make decisions for topics or products that I was not familiar, and I was told that as the senior member I should know how to make decisions about something that I'm not familiar with." (*Id.* at 72:4–9.) Before the EEOC, Zhuang alleged, "[w]hen a young white could not perform his planed job well beyond his planned training, he was not to blame . . . but a 57 years old Asian who helped was to punish and terminate. I was the only Asian in the team . . . . I was older (57) and they were both at least ten years younger. It was discrimination based on my race, age, and association with a disabled individual." (ECF No. 11 at 17.) Zhuang's allegations exist in a vacuum. For purposes of summary judgment, even assuming Zhuang's allegations are true, the inferences are speculative and do not constitute evidence to support her claim. In short, the record simply does not permit an inference of age discrimination. *See Ayres v. MAFCO Worldwide LLC*, Civ. A. No. 1812071, 2020 WL 4218395, at *7 (D.N.J. July 23, 2020).

PM's animus towards Zhuang, Zhuang's generally disrespectful attitude towards superiors and others is apparent from numerous excerpts in the summary judgment record, as does her disregard or distaste for her assigned responsibilities. (*See, e.g.*, 2016 Performance Management Form for Hong Zhuang, ECF No. 86-3 at 105 (Zhuang "does not exhibit good collaboration skills or teamwork / integration in the new organization. As a new organization [], we need the support of the senior team members to coach and transfer the knowledge to the juniors and less experienced team members."); *id.* at 109 ("Regarding the problem solving skills Hong did not demonstrate enough improvement. She is afraid to make mistakes and fail and do not try enough to resolve problems or provide input in questions related to product lines that she is not familiar."); ECF No. 86-3 at 125, Dep Tr. K. Dye at 94:7–10 ("her continuing to disrupt our work and individuals at work for an issue that happened [years ago]"); *id.* at 111:23–113:1 ("obviously she was upset about something and kept on bringing topics that had nothing to do with work[]"); *id.* at 193:11–17 (she was "disrespectful at another meeting," "she knew [] she wasn't supposed to interrupt her manager," she was "blatantly disrespectful"); ECF No. 86-3 at 145, Dep. Tr. P. Newcomb at 118:18–21 ("secondhand knowledge that she was disruptive in quite of the few of the training meetings. She was constantly bringing up issues, but made no suggestions."); Performance Improvement Plan Memo, ECF No. 86-3 at 150 (Zhuang "consistently challenges the assignments" her managers give her and assumes she is given the assignment because someone did not perform their job.).) *See Verma v. Univ. of Pennsylvania*, 533 F. App'x 115, 118 (3d Cir. 2013) (finding, in Title VII case alleging race and national origin discrimination, that employer "proffered a legitimate, non-discriminatory reason for terminating [employee]—namely, her ongoing conflicts with co-workers and supervisors, repeated insubordination, and poor work performance").

Zhuang's arguments before the Court and citations to record evidence fail to raise a genuine dispute of material fact on her ADEA claims sufficient to defeat summary judgment in EMD PM's favor. *See Pizio v. HTMT Glob. Sols.*, Civ. A. No. 09-1136, 2014 WL 2926499, at *3 (D.N.J. June 27, 2014). Ultimately, Zhuang has simply failed to provide evidence from which a reasonable factfinder could find in her favor on the ADEA claim.

Accordingly, EMD PM's Motion for Summary Judgment as to Count VII is **GRANTED**.

### iii. Title VII (Count IV)

EMD PM moves for summary judgment on Zhuang's Title VII claims for alleged racial discrimination due to Zhuang's Asian heritage, on the basis that Zhuang has failed to raise an inference of discrimination. Zhuang does not appear to oppose the motion. (*See generally* ECF No. 91.)

For discrimination claims under Title VII, a plaintiff must show: (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, such as termination, and (4) that the circumstances around the adverse employment action give rise to an inference of unlawful discrimination. *Flax v. Delaware*, 329 F. App'x 360, 363 (3d Cir. 2009) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)).

Generally, Zhuang asserts "Caucasian" employees received more favorable treatment by EMD PM. (ECF No. 91-1 at 281 ("We were a team of 6 members. Only Stephanie Brockenbrough, who is Black, and me, who is Asian, were required to write weekly work reports. Other team members, all of whom are Caucasian, were not required to write weekly reports.")). Zhuang also alleges she was discriminated against because she was criticized for declining to stay in Philadelphia for a work-related dinner but another employee, who was white, was not. (*Id.*) She contends she was terminated for suggesting a white employee take up additional workload

following an employee's retirement. (*Id.* at 282.) Additionally, she alleges a white employee was treated favorably even though he did not "appropriately check" certain labels and "did not follow adequate compliance practices." (*Id.* at 283.)

The evidence cited by Zhuang in support of these claims is insufficient to raise a genuine issue of material fact because Zhuang has not shown her race influenced EMD PM's decision to terminate her. *Jasmin v. New Jersey Econ. Development Auth.*, Civ. A. No. 16-1002, 2020 WL 3411171, at *8 (D.N.J. June 22, 2020) (providing that where there is no evidence of factual circumstances surrounding the termination, or of the role race played in them, plaintiff's Title VII claim would fail); *Sagun v. Delta Air Lines, Inc.*, Civ. A. No. 168881, 2019 WL 1961330, at *4 (D.N.J. May 2, 2019) (holding that where there was no evidence to suggest plaintiff's race had any bearing on the alleged unfair distribution of work, plaintiff's claim would not survive the motion for summary judgment). Indeed, Zhuang does not point to any specific evidence that links her complaints about preferential treatment shown to white employees to her alleged racial discrimination or termination on April 3, 2017. (*See* ECF No. 71 at 17.) Zhuang cannot recall anyone ever making derogatory comments about her Asian heritage (*see* ECF No. 91-1, Dep. Tr. H. Zhuang at 69:24–25) and her race never came up during the PIP meeting that preceded her termination. (*Id.* at 212:22–23.) Because Zhuang has failed to raise a genuine issue of fact to support her Title VII claim for discrimination on account of her race, the Court grants summary judgment for EMD PM on this count.

Accordingly, EMD PM's Motion for Summary Judgment as to Count IV is **GRANTED**.

### 4. Retaliation in Violation of FMLA and NJFLA (Counts V and VI)

EMD PM argues it is entitled to summary judgment on Zhuang's FMLA and NJFLA retaliation claim because: (1) Zhuang did not invoke her rights under the FMLA or the NJFLA and

(2) Zhuang was terminated for a legitimate non-discriminatory reason, and therefore, Zhuang cannot establish pretext. (ECF No. 86-1 at 19.) Zhuang contends EMD PM retaliated against her for taking time off due to her husband's lung cancer. (ECF No. 91-1 at 35–36.)

The FMLA provides "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period . . . [i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The FMLA also states:

> [A]ny eligible employee who takes leave under [the FMLA] . . . shall be entitled, on return from such leave—(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a). Employers may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a).

Under the NJFLA, an employee is entitled to "a family leave of 12 weeks in any 24–month period upon advance notice to the employer . . . [i]n the case of a family member who has a serious health condition." N.J. Stat. Ann. § 34:11B–4. Like the FMLA, the NJFLA also provides that an employee taking leave under the NJFLA is "entitled to be restored by the employer to the position held by the employee when the leave commenced or to an equivalent position of like seniority, status, employment benefits, pay, and other terms and conditions of employment." N.J. Stat. Ann. § 34:11B–7.

"Due to the similarity of the statutes, courts apply the same standards and framework to claims under the FMLA and the NJFLA." *Wolpert v. Abbott Labs.*, 817 F. Supp. 2d 424, 437 (D.N.J. 2011) (citing *Santosuosso v. NovaCare Rehabilitation*, 462 F. Supp. 2d 590, 596 (D.N.J. 2006)). Therefore, this Court will address Zhuang's retaliation claims under the FMLA and the

NJFLA together. *Yamamoto v. Panasonic Corp. of N. Am.*, Civ. A. No. 12-2352, 2013 WL 3356214, at *8 (D.N.J. July 2, 2013) (addressing plaintiff's FMLA and NJFLA claims together).

A court's first step is to analyze whether the plaintiff has established a prima facie case of unlawful retaliation. *Raytheon Co. v. Hernandez*, 540 U.S. at 44, 50 (2003). To do so, a plaintiff must show that: (1) she invoked her right to leave under both the FMLA and NJFLA, (2) she suffered an adverse employment action, and (3) the adverse action was casually related to the plaintiff's exercise of her rights under both the FMLA and NJFLA. *Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 158–59 (3d Cir. 2015); *Erdman*, 582 F. 3d at 508–09. *Hall-Dingle v. Geodis Wilson USA, Inc.*, Civ. A. No. 15-1868, 2017 WL 899906, at *7 (D.N.J. Mar. 7, 2017); *Dieng v. Computer Sci. Corp.*, Civ. A. No. 14-5381, 2016 WL 885389, at *10 (D.N.J. Mar. 8, 2016).

Once a plaintiff establishes a prima facie retaliation claim under the FMLA and NJFLA, the claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas*. *See Truesdell v. Source One Pers., Inc.*, Civ. A. No. 07-1926, 2009 WL 1652269, at *4 (D.N.J. June 9, 2009); *see also Colicchio v. Merck & Co.*, Civ. A. No. 080-3593, 2013 WL 310390 (D.N.J. Jan. 25, 2013) (observing that "New Jersey courts use the *McDonnell Douglas* analysis to decide [NJ]FLA retaliation claims") (citation omitted). Under this framework, a plaintiff must first establish a prima facie case by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802. The burden then shifts to the defendant to articulate "some legitimate, nondiscriminatory reason for" its actions. *Id.* If the defendant satisfies this burden, the plaintiff must then prove the defendant's purportedly legitimate reason is merely a pretext for discrimination. *See id.* at 804–05. To do this, "the plaintiff must point to some evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (applying *McDonnell Douglas* framework in employment discrimination case brought under Title VII).

Specifically, EMD PM contests the first of the three elements necessary for Zhuang to establish a prima facie claim for retaliation under the FMLA and NJFLA because Zhuang "did not invoke her rights under the FMLA [or the NJFLA]." (ECF No. 86-1 at 19.) EMD PM argues Zhuang confirmed in an email to Dye she did not apply for or request a leave of absence under the FMLA. (*Id.* ("Yes, I confirm that I have not applied for or requested a leave of absence under the Family and Medical Leave Act ('FMLA'), nor have I been denied taking time off for FMLA purposes.")) Zhuang contends she only told Dye "she did not request an FMLA leave," because "Ms. Dye falsely told her that the FMLA applies only to unpaid time off. Thus, Dr. Zhuang merely confirmed that she did not take any unpaid time off because of her husband's cancer." (ECF No. 91 at 39.)

"To evoke the requirement for unpaid FMLA leave, an eligible employee need not specifically assert his rights under the FMLA, or even mention the FMLA itself." *Sarker v. Trump Entm't Resorts, Inc.*, Civ. A. No. 10-4243, 2012 WL 4609485, at *3 (D.N.J. Oct. 1, 2012) (citing 29 C.F.R. § 825.208(a)(2)). All that is required is that the employee state an FMLA qualified reason for the leave. *Id.* ("[T]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."); *Holpp v. Integrated Commc'ns Corp.*, Civ. A. No. 03-3383, 2005 WL 3479682, at *5 (D.N.J. December 20, 2005). Moreover, 29 C.F.R. § 825.302(c) requires an employer to "inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the

leave to be taken." 29 C.F.R. § 825.302(c) (2006). "In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA qualifying, based on information provided by the employee." *Id.* § 825.208(a); *Sarker*, 2012 WL 4609485, at *3. The designation generally must be made before the leave starts, but only in limited circumstances can leave be designated as FMLA-protected after it has ended, usually within two business days. *Id.* § 825.208(e); *St. Cyr v. Brandywine Senior Living, LLC*, Civ. A. No. 10-5868, 2012 WL 2344858, at *4 (D.N.J. June 20, 2012).

Pursuant to the FMLA and its implementing regulations, "when an employee provides notice of the need for FMLA leave, the employer shall provide the employee with notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 C.F.R. § 825.301(b)(1); *see Radlinger v. Camden Cty.*, Civ. A. No. 12-6862, 2014 WL 5293656, at *4 (D.N.J. Oct. 15, 2014). This notice should contain, for example, whether the leave counts against the FMLA entitlement, whether the employee is required to provide medical certification of a serious health condition and the consequences for failure to do so, any requirement to provide a fitness for duty certificate upon restoration of employment, and the right to the same position at the end of the leave. *Id.* The employer should request certification, in most cases, prior to or immediately after leave commences, but may do so some time thereafter if there is reason to question the reason for the leave or its duration. *Id.* § 825.305.

Here, the record and, in particular, the deposition testimony create a dispute of material fact about what Zhuang told EMD PM regarding her need for leave to take care of her sick husband. For example, Zhuang stated she sent "an e-mail to Luciana [Felix] to say, sometimes I say I need to be with my husband for his treatment, for this day I need to take it off, and sometimes I just say

29

I need this day off." (ECF No. 91-1, Dep. Tr. H. Zhuang at 82:17–20.) She contends nobody told her she could take FMLA leave to care for her sick husband. (*Id.* at 84:17–18.) In March 2017, upon learning that FMLA was available to employees to care for sick family members with serious health conditions, Zhuang testified she discussed her options under FMLA with Dye.[13] (*Id.* at 85:4–9.) Dye "made it clear" Zhuang "taking time off, paid time off, was not covered by FMLA, so [Zhuang] trusted her, [and] did not look for [FMLA protection]." (*Id.* at 85:7–9.) According to Zhuang, Dye "just told me that if I took paid time off, it was not protected." (*Id.* at 85:15–16.) Zhuang also testified she told Dye she took the time off to "take care for [her] husband." (*Id.* at 85:17–21.) Felix testified she first learned about Zhuang's husband's cancer during one of Zhuang's performance reviews. (ECF No. 91-1, L. Felix Dep. Tr. at 184:4–13.)[14] Zhuang testified Felix knew about her husband having cancer the week of April 8, 2017. (ECF No. 91-1, H. Zhuang, Dep. Tr. at 113:4–10.)

Dye testified she was approached by Zhuang's manager who indicated Zhuang would "need some additional time" off to care for her husband. (ECF No. 91-1, Dep. Tr. K. Dye at 42:15–24.) Dye understood the time off was to "care for her husband's sickness," but "[did not] know what that was." (*Id.* at 42:23–24.) Dye stated:

> I asked her if she needed time to care for her husband, and she said, no, she didn't need any time. And I said, are you sure -- do you understand what FMLA is, and that you can take intermittent leave? And she said, I don't need to take any time off.

(*Id.* at 43:7–13.) In connection to an email from 2016, Felix informed Dye that Zhuang's husband was receiving some sort of medical treatment. (*Id.* at 84–85.) Still, at no point did Dye ask about

---

[13] Zhuang stated she was not aware of the FMLA in 2016. (*See id.* at 84:10–12.)

[14] Felix testified she cannot say for certain whether or not she told Dye about Zhuang's husband having cancer. (ECF No. 91-1, Dep. Tr. L. Felix at 186:4–10.)

the kind of treatment Zhuang's husband was receiving. (*Id.* at 85:11–16.) Dye testified, even up until the time of reading Zhuang's complaint, she did not know Zhuang's husband had cancer. (*Id.* at 45:17–21.) During Dye's discussion with Zhuang concerning FMLA, Dye did not ask about Zhuang's husband's condition and did not know he was "not just sick in the short-term period." (*Id.* at 45:18–23.)

Viewing the inferences from the facts in the record in a light most favorable to the plaintiff, a reasonable jury could find Zhuang communicated to EMD PM her need to take care of her sick husband. *See Bartnicki v. Vopper*, 200 F.3d 109, 114 (3d Cir. 1999) (recognizing the duty to view inferences in a light most favorable to the non-moving party); *Zawadowicz v. CVS Corp.*, 99 F. Supp. 2d 518, 529 (D.N.J. 2000) (finding that even where plaintiff did not expressly provide the employer with a reason for needing leave, a reasonable juror could find sufficient evidence that notice was adequate and the employer otherwise knew the explanation for plaintiff's absences). In any event, this determination of whether the content of the notice given by Zhuang was adequate under the FMLA and NJFLA is a question of fact and credibility best suited for the jury. *See Hopson v. Quitman Co. Hospital and Nursing Home, Inc.*, 126 F.3d 635, 640 (5th Cir. 1997) ("[I]t is our opinion that the adequacy of [] notice is a fact issue . . . . Such determinations are better left to the jury with its traditional function of assessing human behavior and expectations."). Therefore, because the deposition testimony creates a genuine issue of material fact regarding the adequacy of notice in this matter, summary judgment on the issue is inappropriate.

Furthermore, the regulations themselves highlight it is the employer's responsibility to determine the applicability of the FMLA and to consider requested leave as FMLA leave. Specifically, the regulations provide that if an employee has not provided enough information to put the employer on notice that FMLA-qualified leave is needed, the employer is expected to

obtain "any additional required information through informal means." 29 C.F.R. § 825.303(b). Therefore, "it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee." 29 C.F.R. § 825.208(a); *see Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 587 (3d Cir. 2004). Therefore, the burden was on EMD PM to obtain that information, make an FMLA determination, and communicate that decision to Zhuang. Because the deposition testimony creates a genuine issue of material fact regarding, at the very least, the adequacy of notice in this matter, summary judgment on the issue is inappropriate. *Washington v. Cooper Hosp/Univ. Med. Ctr.*, Civ. A. No. 03-5791, 2005 WL 3299006, at *7 (D.N.J. Dec. 2, 2005); *Stowell v. Black Horse Pike Reg'l Sch. Dist.*, Civ. A. No. 1706633, 2019 WL 6044937, at *4 (D.N.J. Nov. 15, 2019) (recognizing that "the central test is not whether the employee gave every necessary detail to determine if the FMLA applies, but how the information conveyed to the employer is reasonably interpreted") (quoting *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007)).

Accordingly, EMD PM's Motion for Summary Judgment as to Counts V and VI is **DENIED**.

### 5. Perceived Disability Discrimination in Violation of NJLAD (Count VIII)

Zhuang alleges EMD PM discriminated against her because it perceived her to be disabled in violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 *et seq*. ("NJLAD"). (ECF No. 71 at 19.) EMD PM contends Zhuang cannot establish an NJLAD perceived disability discrimination claim because (1) Zhuang cannot show EMD PM perceived Zhuang as having a mental condition that would qualify as a disability under NJLAD and (2) even if Zhuang could establish a prima facie case, Zhuang's employment was terminated for a legitimate non-discriminatory reason and therefore, Zhuang cannot establish pretext. (ECF No. 86-1 at 28–29.)

The NJLAD was enacted with the express purpose of protecting civil rights and declares that the opportunity to gain employment without fear of discrimination is a civil right. *Viscik v. Fowler Equip. Co., Inc.*, 800 A.2d 826 (N.J. 2002). The NJLAD protects both physical and non-physical disabilities. *See* N.J. Stat. Ann. § 10:5–5(q) (2003). An individual is non-physically disabled if he has (or is perceived to have) "any mental, psychological or developmental disability resulting from . . . psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." *Id.*

In analyzing employment discrimination claims under the NJLAD, the New Jersey Supreme Court has adopted the analysis outlined by the Supreme Court in *McDonnell Douglas*. *See Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 854 (D.N.J. 2019); *Andersen v. Exxon Co.*, *U.S.A.*, 446 A.2d 486 (N.J. 1982). Under this burden-shifting analysis, the plaintiff bears the burden of persuading the trier of fact (by the preponderance of the evidence) that there has been actionable discrimination (satisfying the plaintiff's prima facie case). *Kee v. Camden Cty.*, Civ. A. No. 04-0842, 2007 WL 1038828, at *6 (D.N.J. Mar. 30, 2007) If a plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the action at issue. *See Anderson*, 446 A.2d at 499. If the defendant succeeds in articulating a legitimate, non-discriminatory reason for the employment action, the plaintiff bears the burden of negating defendant's showing by demonstrating that the proffered reason is a pretext for unlawful discrimination. *See id.* Despite the shift of the burden of production to defendant, the plaintiff bears the burden of persuasion throughout the case. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

To establish a prima facie case of discriminatory discharge under the NJLAD, the employee must prove (1) he was disabled or perceived as disabled, (2) he was otherwise qualified to perform the essential functions of the job at a level that met the employer's legitimate expectations, (3) he nevertheless was fired, and (4) the employer sought someone to perform the same work after he left. *See Viscik*, 800 A.2d at 833–34; *Muller v. Exxon Research & Eng'g Co.*, 786 A.2d 143 (N.J. Super. Ct. App. Div. 2001) (citing *Clowes v. Terminix Int'l, Inc.*, 538 A.2d 798 (N.J. 1988)).

EMD PM argues Zhuang cannot meet her burden because she cannot prove she was disabled within the meaning of the NJLAD at the time of her termination. (ECF No. 86-1 at 36.) The NJLAD, however, defines disability broadly to include any "physical disability [or] infirmity [] which is caused by bodily injury [] or illness." *Simonetti v. Broadridge Fin. Sols., Inc.*, Civ. A. No. 10-3903, 2012 WL 32931, at *12 (D.N.J. Jan. 5, 2012).

Here, the record is replete with evidence suggesting EMD PM believed Zhuang was mentally disabled or impaired. For example, Dye wrote in an email dated November 30, 2016, "I don't know if we shouldn't suggest she goes out on mental leave too." (ECF No. 91-1 at 333.) Global HR Business Partner Miriam Graw ("Graw") wrote to Dye, "do you think that she has a psychological issue that explains the behavior? That should not prevent us from taking action, but maybe we should be prepared for an 'she cannot help it, she's ill' argumentation if we ended up firing her[.]" (*Id.*). In fact, Dye mandated Zhuang get psychological counseling and evaluation.

Q: Did Ms. Dye ever ask or require you to seek some sort of psychological counseling or evaluation?

A. She asked me to call EPA.

Q. You mean EAP?[15]

A. EAP, yes.

Q. Did you do that?

A. Yes.

(ECF No. 91-1 at 236, Dep. Tr. H. Zhuang at 236.)

Here, EMD PM's motion for summary judgment is denied because issues of material fact exist concerning whether EMD PM perceived Zhuang as disabled. *See Milelli v. Collingswood Bd. of Educ.*, Civ. A. No. 16-963, 2018 WL 1535210, at *7 (D.N.J. Mar. 29, 2018). Indeed, the record evidence suggests Dye thought Zhuang required professional mental health support and mandated she seek such help. (*See* ECF No. 91-1 at 377 ("Please seek professional health . . . I am serious you must call the EAP you keep dwelling on this topic.")) Dye also emailed Zhuang stating "Call [EAP] immediately. I want confirmation that you spoke to a counselor[.]" (*Id.* at 378.) Felix also wrote in an email to Dye, "You are right she really needs professional counseling help. I think she is paranoid." (ECF No. 91-1 at 380.) Therefore, from the deposition testimony and factual record, Zhuang may be able to establish that EMD PM perceived Zhuang as disabled. As such, it is clear to this Court genuine issues of material fact exist regarding these issues. *Ferren v. Foulke Mgmt. Corp.*, Civ. A. No.15-3721, 2017 WL 634511, at *5 (D.N.J. Feb. 16, 2017).

Moreover, a reasonable jury could find that the reasons offered by EMD PM for Zhuang's termination were merely pretext. In the Third Circuit, to discredit EMD PM's proffered reasons for termination, Zhuang must demonstrate "weaknesses, implausibilities, inconsistencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact-

---

[15] The EAP is the "Employee Assistance Program" and provides outside counseling and support to EMD PM employees.

35

finder could rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir.1992)); *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000). Indeed, the factual record reveals statements suggesting the purported criticisms of Zhuang's job performance were mere pretext to mask unlawful discrimination: for example, Graw's statement "do you think that she has a psychological issue that explains the behavior? That should not prevent us from taking action, but maybe we should be prepared for an 'she cannot help it, she's ill' argumentation if we ended up firing her." (ECF No. 91-1 at 333.) Indeed, Graw wrote this email in connection to Dye's email providing Graw a "heads up" that Zhuang was placed on PIP. (*Id.* at 334.) Viewed in the light most favorable to Zhuang, there is ample evidence that the purported criticisms of Zhuang's job performance were mere pretext to conceal unlawful discrimination. *See Johnson v. Pub. Servs. Enter. Grp.*, Civ. A. No. 10-3795, 2012 WL 4846148, at *7 (D.N.J. Oct. 9, 2012), *aff'd*, 529 F. App'x 188 (3d Cir. 2013). Therefore, summary judgment should be denied. *Curcio v. Collingswood Bd. of Educ.*, Civ. A. No. 04-5100, 2006 WL 1806455, at *13 (D.N.J. June 28, 2006); *DeJoy v. Comcast Cable Commc'ns Inc.*, 968 F. Supp. 963, 988 (D.N.J. 1997).[16]

Accordingly, EMD PM's Motion for Summary Judgment as to Count VIII is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, EMD PM's Motion for Judgment on the Pleadings is **DENIED as MOOT** and EMD PM's Motion for Summary Judgment is **GRANTED in part and**

---

[16] This is not to say, however, that Zhuang will prevail at trial. Indeed, EMD PM may well persuade a jury otherwise. But at this juncture, summary judgment is denied. *See Ferren*, 2017 WL 634511, at *5.

**DENIED in part**. Specifically, Counts I (CEPA), III (ADA), IV (Title VII), VII (ADEA) are

**GRANTED**, and Counts II (*Pierce*), V (FMLA), VI (NJFLA), and VIII (NJLAD) are **DENIED**.

Zhuang's Cross-Motion for Summary Judgment is **DENIED**.


*/s/ Brian R. Martinotti*
**BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated: January 29, 2021